[No. 28389. *En Banc.* September 26, 1941.]

ARTHUR MILES, *Individually and as Guardian ad Litem for Wilmer Bunney, a Minor, Respondent,* v. POUND MOTOR COMPANY, *Appellant,* DAVID BUNNEY *et al., Defendants.*[1]

[1]Reported in 117 P. (2d) 179.

*Shank, Belt, Rode & Cook,* for appellant.

*Welts & Welts,* for respondent.

STEINERT, J.—Plaintiff, as guardian *ad litem* for Wilmer Bunney, a boy thirteen years of age, brought suit against defendants, a corporation and two individuals composing a partnership, to recover damages for personal injuries sustained by the minor. The boy's injuries were caused by fire, resulting from an explosion on a truck which was owned by defendant Pound Motor Company and was being maneuvered at the time by a member of the partnership composed of David Bunney and Clarence Bunney, the uncle and father, respectively, of the minor. In the same action, plaintiff, as assignee, also sought to recover for the necessary medical and hospital expenses incident to the treatment of the injured boy. The two Bunney brothers, composing the partnership, defaulted, and, upon a trial by jury, a verdict was returned in favor of plaintiff against all of the defendants. From that judgment, defendant Pound Motor Company alone has appealed.

The sole question involved here is whether or not, under the doctrine of *respondeat superior,* appellant is liable for the negligence of defendant David Bunney, who was in charge of, and was maneuvering, the truck at the time of the accident. The facts are practically without dispute, and will be related as the jury must have found them.

Appellant, Pound Motor Company, whose name has since the accident been changed to J. R. Watkins Motor Company, was engaged in the business of buying and selling new and second-hand Ford cars and trucks in Mount Vernon, Washington. Defendants, David Bunney and Clarence Bunney, brothers residing in Mount

Vernon, were copartners conducting a trucking business in that city and in Skagit county.

Bunney Brothers owned two 1935 Ford trucks which they used in their trucking business. One of the trucks was customarily operated by David Bunney, and the other by Clarence Bunney. Inasmuch as the two trucks were of the same make and model, we shall, in order to distinguish them, refer to them at times herein as David's truck and Clarence's truck, respectively, although, as has already been indicated, the title to both trucks was actually in the partnership. David's truck was equipped with an hydraulic hoist and a steel body weighing from eight hundred to one thousand pounds; Clarence's truck was equipped with a hoist and a wooden body.

A few days prior to January 4, 1940, David Bunney entered into negotiations with appellant's salesman and with its president for the purchase from appellant of a new 1938 Ford truck chassis, the sale price of which was $714, including the sales tax. It was contemplated that David's truck was to be turned in as part of the purchase price of the new truck, and the balance was to be paid in cash. David, however, desired to retain the steel body which was on his truck, for subsequent use either upon the new truck or else upon Clarence's truck.

The parties could not at first agree upon the price to be allowed for David's truck minus its hoist and steel body. Finally, however, on the evening of January 3rd, they arrived at an agreement under which David Bunney was to take the new 1938 Ford truck at the stipulated price, and was to turn in his old 1935 truck together with its hoist and, in addition, the wooden body on Clarence's truck, which appellant had seen some time before. For the truck and equipment thus to be turned in, David Bunney was to have credit in

the sum of $375 on the purchase price of the new truck.

The deal was consummated on those terms on the next day, January 4th, in the following manner: After the purchase and sale order had been made out and signed by the parties, David Bunney took his copy of the order to a local bank and there concluded an arrangement under which he gave the bank a chattel mortgage on the new truck together with some additional property, and received in return a cashier's check drawn in favor of appellant in the sum of $339, which was the balance of the purchase price to be paid on the new truck. He then returned to the office of appellant for the purpose of taking delivery of the 1938 truck, and at that time delivered to appellant the cashier's check and a certificate of title covering his old truck. He received in return the title papers to the new truck and accepted delivery of the vehicle.

During all this time David's truck was standing in the street near the home of defendant Clarence Bunney, and the wooden body which was included in the deal was still upon Clarence's truck.

Immediately upon conclusion of the negotiations with respect to the sale and exchange of the two trucks and the wooden body, the parties entered upon a further conversation in which they effected an agreement or understanding with reference to the delivery by David Bunney of his old truck and the body on Clarence's truck to appellant. This action hinges upon the legal status occupied by David Bunney in attempting to make delivery of the old truck and the wooden body to appellant at its place of business. In order to have the exact details before us, we quote the testimony regarding the agreement. David Bunney testified, on direct examination:

"Q. Tell me what, if any, request Bert Pound [appellant's president] then made upon you after you had transferred the title, with reference to the truck and body which Pound Motor Company had bought? A. When I come to take delivery on the 1938 truck I asked him if I could keep the 1935 truck a few days, that I was going to be rather busy. 'Yes,' he said, 'but will you change the bodies and bring it down as soon as you can?' I said I would. Q. Tell me this, what was the character of the body on the truck that had to be changed? A. The one that was on the truck was an all steel bed. Q. What was to be put on it? A. There was to be a wooden body put on it. Q. Approximately what did the steel body weigh that had to be taken off? A. It must have weighed 800 to 1,000 pounds."

On cross-examination, he testified as follows:

"Q. On the third, then, when you finally came to your agreement late in the afternoon, was there any discussion about *when* [Italics ours] you were going to deliver, or turn over the physical possession of the 1935 truck to Pound? A. No, there wasn't anything said about it at all. Q. What discussion did you have with them as to which bed would go on the 1935 truck when you took your steel bed off that you wanted to keep? A. I told them they could have this wooden bed. They had seen the bed, it was on my brother's truck. Q. That was also discussed on the third, as to which bed they were to get? A. I am not sure it was the third, but during the time we were making the deal. Q. A day or two before it was actually closed? A. Yes. . . . Q. Did you have any more discussion on the morning of the 4th as to *when* [Italics ours] you were to deliver this 1935 truck that you were trading in? A. No, not—there wasn't anything said about delivery at all. Q. There was nothing said about that until the deal was all completed? A. Until it was all completed. Q. Then you said, as I recall your testimony on direct, that you asked Pound if you could keep the 1935 truck for a day or two until you had time to switch the bodies? A. I had some work, I was figuring on filling a man's yard with dirt. Q. Of course you had to get your steel body off of there too, because that belonged

to you? A. I kind of thought they would take it off when they took their wooden body. Q. Was that part of the deal? A. There wasn't anything said who was to change the bodies. They was to get the truck and wooden body, but I didn't say I would put the body on for them. Q. He didn't tell you he would take your body off for you, did he? A. No, there wasn't anything said about that. Q. And you asked him then after you had signed up all the papers all around and you had taken delivery of the 1938, you asked him if you could keep the 1935 for a day or two? A. Yes. Q. And he said, yes, you could? A. That is right. Q. And to switch the bodies and then bring his truck in, is that it in substance? A. Yes, he said to change the bodies and bring the old truck down as soon as I could. Q. In other words, to bring his truck with his wooden body on it, for you to get your steel body off from it? A. I imagine that would be it."

Appellant's salesman and its president both testified that it was agreed, as part of the original transaction of sale, that David Bunney was to change the beds and to deliver his old truck and the body from Clarence's truck to appellant. Since, however, that testimony was unfavorable to respondent upon the question involved in this action, and since it evidently was not accepted by the jury, we will not take it into consideration in our determination of the question here presented.

At the conclusion of the entire transaction and agreement made on January 4th, David Bunney took the new, 1938 truck to his home in Mount Vernon. On the following day, he concluded to make delivery of his old truck and the body from Clarence's truck, as had been agreed upon under his arrangement with appellant on January 4th. David's truck was then still in the street in front of Clarence Bunney's home, and the wooden body was still on Clarence's truck.

In order to make the change of truck bodies, David

Bunney procured the assistance of another brother, Daniel Bunney. David attempted first to back the old truck from its position in the street, but in the course of that attempt one of the wheels of the truck "dropped in the mud and got stuck." He then hooked the 1938 truck onto the front of the old truck and endeavored to pull the latter forward while its motor was running. Some defect in the fuel pump of the old truck, however, interfered with the proper functioning of its carburetor.

David thereupon procured a can of gasoline and at the same time summoned his nephew, Wilmer Bunney, who was playing in his father's front yard, to assist in the intended operation. David then took his position in the 1938 truck, intending to drive it ahead and thus pull the old truck forward; Daniel seated himself at the wheel of the old truck, prepared to start the motor and thus assist in the further movement of that truck; and Wilmer was instructed to pour the gasoline from the can, which had been given him by David, into the carburetor of the old truck. The operation had just begun when the old truck backfired and ignited the gasoline which Wilmer was pouring into the carburetor. As a result of the explosion, Wilmer's clothing caught fire, and before it could be extinguished he was seriously burned. The negligence of David Bunney, in instructing and allowing Wilmer to pour the gasoline into the carburetor of the old truck, is not disputed.

Upon these facts, we come to the consideration of the legal question here involved.

Respondent was, of course, required to establish the relationship of master and servant, or principal and agent, between appellant and David Bunney, or Bunney Brothers, in order to hold appellant liable for the negligence of David Bunney. Appellant, on the contrary,

contended and still insists that David Bunney's legal status at the time of the accident was not that of a servant or agent of appellant, but rather that of an independent contractor, to which the doctrine of *respondeat superior* does not ordinarily apply.

The court instructed the jury as follows:

"Before the plaintiff [respondent] in this case can recover from the defendant [appellant] Watkins Motor Company [formerly Pound Motor Company], he must prove by a preponderance of the evidence that David Bunney was a servant and agent of said defendant Motor Company. If, on the other hand, David Bunney, in the performance of his duty to deliver the truck to said Watkins Motor Company, was acting as an independent contractor, then said Watkins Motor Company would not be liable for any negligent act of David Bunney.

"A servant or employee is a person employed to perform service for another in his affairs, and who with respect to his physical conduct in the performance of the service is subject to the other's control or right to control the manner in which such service is performed. On the other hand, an independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work. If the defendant David Bunney was an independent contractor at the time of the accident complained of, defendant Pound Motor Company would not be liable to the plaintiff in this case."

No exception to that instruction was taken by either party, and it therefore became the law of the case.

■ Respondent's theory is that the transaction relating to the sale and transfer of the two trucks and the wooden body was fully completed between the parties by the execution of the purchase order and the reciprocal acceptance of, and assertion of title to, the various properties by the respective parties; that, in

law, delivery of the old truck and the wooden body was effected as of the places where they were then located; that the subsequent agreement for delivery by David Bunney of the old truck and the wooden body to appellant at its place of business was separate and distinct from the original transaction; that the later agreement was one which, in law, constituted David Bunney the servant or agent of appellant in the delivery of his old truck and the wooden body; and that therefore appellant is liable for the negligence of David Bunney.

For several reasons, we cannot accept that theory as correct. In the first place, the evidence upon which respondent relies, together with the reasonable inferences to be drawn therefrom, is inconsistent with that theory.

If, as David Bunney testified, nothing relative to the changing of bodies and the delivery of David's truck and the wooden body was said or contemplated prior to the later agreement, and if, as contended by respondent, the original transaction was fully consummated without regard to the matter of delivery, then why should David Bunney have said anything at all to appellant thereafter with respect to such delivery? If it was understood or contemplated that each of the parties was to take delivery of his or its respective property at the place where it was then located, David Bunney would have had no concern whatever as to how or when appellant took possession of the property which it had purchased from him. All that appellant would have had to do, under those circumstances, would have been to call for and remove its property at once, and David Bunney would have had nothing to say about it. Instead of that, however, Bunney requested and was given further time to change the bodies and make delivery, thus indicating what the

parties themselves understood, and had agreed, was Bunney's obligation. We are not here dealing with a conflict of evidence, to be resolved by the jury; we are simply dealing with the logical inferences to be drawn from facts which we have accepted as being without dispute.

In the next place, while, technically speaking, the signing of the purchase order, the execution of the chattel mortgage by David Bunney to the bank during the course of the negotiations on January 4th, and the immediate delivery of the check by Bunney to appellant, may have been sufficient, as between vendor and vendee, to transfer title to the respective trucks and equipment, those factors did not make up the entire compact between appellant and David Bunney. The parties themselves did not consider that their negotiations had ended with the exchange of titles, as they might have done by then taking leave of one another, each content with the bargain as thus made. On the contrary, there was a continuance or a resumption of negotiations between them with respect to a part of the subject matter of the contract, regarding an element about which, according to David Bunney's testimony, nothing previously had been said, but in which both parties, particularly Bunney, were interested, namely, the time of delivery of his truck and the wooden body.

Under the facts of this case, the transaction must be considered in its entire aspect, and not regarded merely as a series of distinct unrelated, completed parts. At the conclusion of their negotiations on January 4th, the parties had made but one entire contract, under which David Bunney had bought and paid for the 1938 truck, and had sold his 1935 truck and an accompanying body which he was to assemble and deliver as a unit to appellant. In the performance of that con-

tractual duty resting upon him, he was acting for himself and the partnership, not as the agent or servant of appellant.

 There is yet a third ground upon which our conclusion may be predicated. Rem. Rev. Stat., § 5836-43 [P. C. § 6227-43], which is a part of the uniform sales act, provides:

"(1) Whether it is for the buyer to take possession of the goods or for the seller to send them to the buyer is a question depending in each case on the contract, express or implied, between the parties. Apart from any such contract, express or implied, or usage of trade to the contrary, the place of delivery is the seller's place of business, if he have one, and if not, his residence; but in case of a contract to sell or a sale of specific goods, which to the knowledge of the parties when the contract or the sale was made were in some other place, then that place is the place of delivery. . . .

"(5) *Unless otherwise agreed, the expense of and incidental to putting the goods in a deliverable state must be borne by the seller.*" (Italics ours.)

Upon respondent's theory that, at the time of the consummation of the sale and exchange, nothing was said with respect to delivery of the old truck and the wooden body, the uniform sales act as above quoted would undoubtedly be applicable, and under that act the locations of the respective trucks and the body would determine the places of delivery. However, subd. (5) of the same statute made it incumbent upon David Bunney to put his truck and the body from Clarence's truck in a deliverable state. Until the subject matter of the sale was put in such state, there was no delivery.

As already shown, David's truck had upon it a steel body weighing from eight hundred to one thousand pounds, which was to be retained by Bunney, and the wooden body was annexed to another truck which was

in the possession of Clarence Bunney and was customarily operated by him. Before either David's truck or the wooden body could be delivered, it had to be disconnected from other equipment. The duty to make the disconnections, in order that appellant might take its property, was upon David Bunney. Since that had not yet been done at the time of the accident, it cannot be said that delivery had taken place, and hence David Bunney's relation to appellant was not that of servant or agent, but was that of a vendor of personal property performing his duty, imposed by law, of putting that property in a deliverable condition.

Whether we consider the initial transaction with reference to the sale and transfer of the respective equipment and the subsequent oral agreement with reference to delivery as separate contracts or as one entire contract, or whether we consider the later oral agreement merely as evidence of a previous express or implied agreement with reference to delivery, the result is the same. The duty was upon David Bunney to deliver his old truck and the wooden body from Clarence's truck to appellant at its place of business or, at least, to put them in deliverable state, and in endeavoring to perform that duty David Bunney was acting, not as the agent or servant of appellant, but for himself and the partnership of which he was a member. Under those circumstances, his negligence was not imputable to appellant.

What we have thus far said is sufficient to dispose of this case. But since the parties have argued the case solely on the theory that the only question presented is whether, under respondent's evidence, David Bunney must be held to have been the servant or agent of appellant at the time of the accident, or whether he must be held to have been an independent contractor, we shall consider that phase of the matter. We

will proceed upon the assumption, upon which respondent has founded his case, that the agreement for delivery by David Bunney of the old truck and the wooden body was separate and distinct from the initial sales transaction.

While the proposition as presented appears to call for a categorical answer as to whether the relationship between appellant and David Bunney was one of master and servant, or principal and agent, or was one of principal and independent contractor, we think that the question, more accurately stated, is whether the agreement as made was governed by the rules relating to master and servant, or principal and agent, or by those relating to principal and independent contractor. Whatever may be the proper statement of the question, it is necessary that we define the terms "servant" and "independent contractor."

■ According to the generally accepted legal definition, a servant is a person employed to perform service for another under an express or implied agreement, and who with respect to his physical conduct in the performance of the service is subject to the other's control or right to·control. Restatement, Agency, § 220; 1 Labatt, Master & Servant (2d ed.; 1913), § 2.

■ An independent contractor is one who, while rendering service in the course of an independent occupation, represents the will of his employer only as to the result of the work, and not as to the manner or means by which it is accomplished. *Sills v. Sorenson,* 192 Wash. 318, 73 P. (2d) 798; *Hubbard v. Department of Labor & Industries,* 198 Wash. 354, 88 P. (2d) 423; *Washington Recorder Pub. Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718, 124 A. L. R. 667, 682; *Apenese v. Department of Labor & Industries,* 3 Wn. (2d) 45, 99 P. (2d) 629.

■ From these definitions, it will be observed that

the distinction between the two relationships is founded upon the employer's control or lack of control over the conduct of the employee in the performance of the work. In *Hubbard v. Department of Labor & Industries, supra,* we considered the tests by which the two relationships are determined. We there said:

"The ultimate test by which it is determined whether the relation is that of employer and employee or that of principal and independent contractor is to inquire whether or not the employer retained the right, or had the right under the contract, to control the manner of doing the work and the means by which the result was to be accomplished. *Larson v. American Bridge Co.,* 40 Wash. 224, 82 Pac. 294, 111 Am. St. 904; *Glover v. Richardson & Elmer Co.,* 64 Wash. 403, 116 Pac. 861; *Hinds v. Department of Labor & Industries,* 150 Wash. 230, 272 Pac. 734, 62 A. L. R. 225; *Swam v. Aetna Life Ins. Co.,* 155 Wash. 402, 284 Pac. 792; *Hollingsworth v. Robe Lumber Co.,* 182 Wash. 74, 45 P. (2d) 614; *Sills v. Sorenson,* 192 Wash. 318, 73 P. (2d) 798. These cases all hold that the chief, and most decisive, factor in determining whether the relationship is that of employer and employee or that of principal and independent contractor is the right of control over the work or thing to be done.

"This power of control is variously spoken of in the different cases, as the primary, master, dominant, decisive, supreme, vital, final, real, or most significant, test, or as the main, principal, determining, or generally controlling factor or consideration. 71 C. J. 450. Then there are other so-called tests, or rather considerations or factors, which relate to control, and have either a direct bearing or an inferential significance with respect to that question. Among the latter are the nature of the business, the time, place, duration, quantity, and nature of the work performed, the skill and supervision required, the furnishing of equipment, materials, and supplies, the payment of the necessary expenses, the basis of compensation for the work, the right to hire and discharge assistants, and the right to terminate the employment.

"Each of these elements, and many others that might

be named, may be of more or less importance and value in a particular case, according to the facts and circumstances present, but none of them is conclusive in determining the nature of the relationship. Back of them all is the question as to who has the right to control the manner of doing the work and the means by which the ultimate result is accomplished."

Our problem here, then, is to be determined by the application of the rules and principles stated in the foregoing decision to the facts presented in the instant case. We are, of course, still proceeding upon the theory that the agreement for the delivery of the old truck and the wooden body was subsequent to, and entirely separate from, the original contract of sale.

At the time the parties entered upon their negotiations for delivery by David Bunney, the situation was this: Title to, and immediate right of possession of, the old truck and the wooden body were in appellant. David Bunney desired to retain the truck for several days, for reasons best known to himself. Either he desired to use the truck and body, or else he was too busy to remove them from their connections and put them in deliverable state. Appellant agreed to allow Bunney to retain them for the time being. By so doing, appellant incurred the risk of loss of, or damage to, the truck while standing in the street. It is highly probable, also, that Bunney desired to use the old truck and the wooden body in the interim, for without the body, which was then on Clarence's truck, that truck could not be used for hauling; and without changing the steel body then on David's truck onto the new, 1938 truck, the latter could not be used for a like purpose. It will be recalled that David Bunney testified: "I had some work, I was figuring on filling a man's yard with dirt." Whatever may have been the reasons therefor, however, the fact remains that

David Bunney agreed to deliver his old truck and the wooden body.

Under the terms of that agreement, appellant had no control over the manner in which the delivery should be made by David Bunney, or over the means by which the delivery was to be accomplished. Bunney could have chosen any route he desired in making the delivery. He could also have employed any means that he preferred to accomplish that result. He could have brought the truck in under its own power; he could have towed it in; he could have loaded it onto another vehicle and thus delivered it. Whatever means or method he might have employed was of no concern to appellant, for the latter was interested only in the result. In other words, David Bunney represented the will of appellant only in the result to be accomplished, and not in the manner or means of effecting that result. His status, therefore, if not exactly that of an independent contractor in the usual sense, was at any rate one which is governed by the rules applicable to that relationship, rather than by the rules applicable to master and servant, or principal and agent. Consequently, David Bunney's negligence was not imputable to appellant.

The judgment is reversed, with direction to the trial court to dismiss the action as against appellant.

Robinson, C. J., Beals, Simpson, and Jeffers, JJ., concur.

Blake, J. (dissenting)—In its opening brief, appellant states:

"In this case the sole question is whether David Bunney, the uncle of the respondent, in moving this truck, was the servant of the appellant, *or an independent contractor,* and the answer to this question will decide all the assignments of error." (Italics mine.)

Disposing of this issue, the majority say:

"His status, therefore, *if not exactly that of an independent contractor in the usual sense,* was at any rate one which is governed by the rules applicable to that relationship rather than by the rules applicable to master and servant, or principal and agent." (Italics mine.)

In thus holding, as a matter of law, the majority, as I view it, have invaded the province of the jury. The issue tendered by plaintiff in pleading and proof was briefly this: That the deal was consummated on January 4th; that Pound Motor Company acquired title to the truck and body on that date; that appellant, on that day, inspected the truck and body at or near .the Bunney premises, where it then and there accepted delivery. The theory of plaintiff is, therefore, simply this: That, on January 5th, David Bunney was operating a motor vehicle belonging to Pound Motor Company; that the presumption follows that he was acting for the owner; that, unless this presumption is overcome by disinterested testimony, a case is made for submission to the jury.

To the issue so tendered, and the theory so presented, appellant countered with the theory of independent contractor. At its request, the court instructed the jury as follows:

"Before the plaintiff in this case can recover from the defendant Watkins Motor Company, he must prove by a preponderance of the evidence that David Bunney was a servant and agent of said defendant Motor Company. If, on the other hand, David Bunney, in the performance of his duty to deliver the truck to said Watkins Motor Company, was acting as an independent contractor, then said Watkins Motor Company would not be liable for any negligent act of David Bunney.

"A servant or employee is a person employed to perform service for another in his affairs, and who

with respect to his physical conduct in the performance of the service is subject to the other's control or right to control the manner in which such service is performed. On the other hand, an independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work. If the defendant David Bunney was an independent contractor at the time of the accident complained of, defendant Pound Motor Company would not be liable to the plaintiff in this case."

Now, the only evidence in support of the theory presented by this instruction comes from the lips of the defendants. In other words, the only evidence tending to rebut the presumption that David Bunney was acting as servant or agent of Pound Motor Company came from the mouths of interested witnesses. I believe our decisions are uniform in holding that the relationship between the operator and the owner of a motor vehicle, under such a state of evidence, is a question to be determined by the jury. *Moore v. Roddie* 103 Wash. 386, 174 Pac. 648; *Mitchell v. Churches,* 119 Wash. 547, 206 Pac. 6, 36 A. L. R. 1132; *McMullen v. Warren Motor Co.,* 174 Wash. 454, 25 P. (2d) 99; *Templin v. Doan,* 187 Wash. 68, 59 P. (2d) 1110. In the *McMullen* case, the court stated the rule as follows:

"When the respondents showed that the appellant was the owner of the automobile, they made a *prima facie* case to the effect that, at the time of the accident, the vehicle was in the possession of the owner, and that whoever was driving it was doing so for such owner. . . . The *prima facie* case so made means only that the case had proceeded upon sufficient proof to that stage where it must be submitted to the jury, *unless the prima facie case should be met by the testimony of disinterested witnesses. . . .* The *prima*

*facie case, however, based upon the presumption, is not met by the testimony of interested witnesses, and, as against such witnesses, the presumption will take the case to the jury."* (Italics mine.)

In the light of the cited decisions, the majority, in holding, as a matter of law, that the relationship between David Bunney and Pound Motor Company was not that of master and servant, has trenched upon the domain of the jury. I therefore dissent.

MAIN, MILLARD, and DRIVER, JJ., concur with BLAKE, J.

*E. K. Brown,* for respondent.

[1]Reported in 117 P. (2d) 187.