[No. 4996-1. Division One. October 13, 1978.]

ETTA MAE FRANKLIN, *as Executrix, Appellant,* v.
PUGET SOUND TUG & BARGE COMPANY, ET AL,
*Respondents.*

518

*Hilyer–Levinski, Gale P. Hilyer,* and *Hans E. Johnsen,* for appellant.

*Detels, Draper & Marinkovich* and *Dwight L. Guy,* for respondents.

DORE, J.—The estate of Albe Franklin brought a wrongful death action based on negligence against Puget Sound Tug & Barge Company (hereinafter called Puget), and Sunco, Inc., for the death of Albe Franklin. At the conclusion of plaintiff's case the trial court granted a motion to dismiss as to Puget.

Plaintiff appeals.

## ISSUES

ISSUE 1: Whether the trial court erred in taking the case from the jury and dismissing Puget as a defendant, and ruling that the relationship of J & D and Puget was that of an independent contractor and not an employer–employee.

ISSUE 2: Was there evidence in the record showing that Puget controlled or had the right to control part of J & D's operation and consequently was a general contractor owing a duty to the deceased plaintiff to furnish him a safe place to work?

ISSUE 3: Assuming a master–servant relationship between the deceased and Puget existed, whether Washington's compensation act precludes plaintiff from recovering against Puget.

## FACTS

Puget is a division of Crowley Maritime Corporation, one of the giant tugboat companies in America. In its business

Puget has occasion to use large pallets constructed of steel and wood, which are approximately 9 by 24 feet by 16 inches and weigh approximately 5,000 pounds. Puget had used these pallets in their business for 15 years and it was time to have them refurbished. The refurbishing process was to have each pallet sandblasted free of rust, have a zinc primer applied in order to retard oxidation, have a final coat of paint applied, and have numbers of identification stenciled on each pallet.

Dan McInturff and his brother Joe, who had some experience in sandblasting and painting, sought the refurbishing job. They formed a partnership called J & D for that purpose. Thomas, the managing agent for Puget, showed Dan the pallets that had to be sandblasted and painted and the vicinity where the work was to be accomplished. J & D then submitted their bid for the work.

J.D. Co.
2019 So. 140th
Seattle, Wash. 98168

To: Crowley Maritime Corporation
Subject: Proposal to clean and paint steel cargo pallets
Estimate: J.D. Co. will furnish all equipment, and labor necessary to sandblast and paint steel framework of above mentioned cargo pallets. J.D. Co. will perform this service for the sum of two–hundred seventy–five (275.00) dollars per pallet (each).
Sequence of operations:
1. Sandblast all steel surfaces 100% free of rust and scale.
2. Apply 4 mils Carboleen 11 zinc primer coat.
3. Apply 2 epoxy finish coats per instructions.
4. Stencil paint designated I.D. numbers at proper locations on each pallet.
Crowley Maritime Corp. agrees to furnish all paints and coatings necessary to properly and expeditiously perform sequence of operations. It is further agreed that Crowley Maritime Corp. will, upon request of J.D. Co., furnish lift

truck operator when needed to handle and maneuver steel pallets for work process.

> J.D. Co.
> Dan McInturff
> /s/ Dan McInturff
>
> Joe McInturff
> /s/ Joe McInturff

Puget accepted J & D's bid.

The pallets were located from 25 feet up to 100 feet from the work area. Under the bid agreement J & D was to supply the sandblasting equipment and labor to do the job while Puget was to furnish the area where the work could be done, all paints and coatings including a zinc primer, as well as forklifts and forklift drivers to lift and carry the pallets to the work area. In addition, Puget supplied the diesel fuel to run the sandblasting equipment. There was an estimated 100 pallets to be refurbished but there was no provision or guarantee as to how many pallets J & D would be allowed to do.

Originally there were 2 or 3 inches of sand over the dock when the work commenced on April 15, 1974, but at the time of the accident on May 8, 1974, over a foot of used sand had accumulated over the work area. There was testimony that J & D had no equipment to remove the used sand but that Puget did.

Dan McInturff was unfamiliar with the use of a forklift so he was given instructions by one of Puget's employees on how to operate this machine. As the work progressed Puget was not satisfied with the work progress and asked J & D to hire additional men. J & D then hired Jerry Dean and Albe Franklin. After about 2 weeks J & D also hired Sunco to aid in expediting the refurbishing process. All Sunco personnel were paid by Sunco and Sunco, in turn, billed Puget for the number of refurbished pallets. The work was divided into two shifts with the usual method of operating being that J & D, comprised of Dan McInturff, Jerry Dean and Albe Franklin, would work from approximately 8:30 in

the morning until 4:30 in the afternoon. Sunco's employees would then work from 4:30 in the afternoon until approximately dusk. The procedure followed was that Puget's employees would pick the pallets up with the forklift, bring them over to the work area and pile them up for work purposes. The individual pallets were then erected on their sides on the dock and/or sand. The sides of the pallets were 16 inches wide. An employee for J & D stated that the erection of the pallets on their sides was "just about 50/50 done by the employees of J & D and by Puget." Although forklift machines are relatively easy to drive, the maneuvering of the forklift instrument itself used in setting the pallets into position for sandblasting was a complicated and intricate process.

Jim Russom, owner of Sunco, testified that when he arrived on the job around the 1st of May, he observed J & D's personnel sandblasting the pallets without bracing of any kind and that he initiated the bracing process (putting four–by–four or six–by–six boards called dunnage under the pallets) for safety reasons. Russom testified that he noticed an accumulation of blasting sand on the dock at the 8– to 10–inch level when he first went on the job. On May 8, 1974, Albe Franklin was sandblasting one of the pallets which was lying on its side when the pallet fell on him causing his death. The fire captain who responded to the rescue call testified that there was no dunnage or bracing of any kind under the particular pallet that fell on the deceased. This testimony was disputed.

After the accident, J & D employee Dean testified that Puget used chains attached to the sides of the pallets which prevented them from falling on the men. Another method of bracing was to nail the particular four–by–four or six–by–six boards into the wooden top of the pallet which would have prevented the pallet from falling face down on the ground.

At the end of plaintiff's case the trial court found that J & D was an independent contractor and that the only duty that Puget owed to the deceased was that of a public

invitee. As a possessor of land, the court held that Puget had a duty to inform J & D's employees of any hidden dangers. As the court could find no hidden dangers, it dismissed the case as to Puget, finding that Puget had no responsibility for the deceased's death.

## DECISION

ISSUE 1: Was J & D and Puget's relationship one of independent contractor or master–servant?

When a challenge to the sufficiency of the evidence is made, the law in Washington is clear in regard to the duty of the trial court in viewing the evidence. In *Jackson v. Standard Oil Co.,* 8 Wn. App. 83, 85, 505 P.2d 139, 141 (1972), the court stated:

> A challenge to the sufficiency of the evidence admits the truth of plaintiff's evidence and requires that it be viewed in the light most favorable to him. Likewise, plaintiff is entitled to the benefit of all reasonable inferences from his testimony. *Heasley v. Riblet Tramway Co.,* 68 Wn.2d 927, 416 P.2d 331 (1966).

■ The present issue concerns itself with the status of J & D in relation to Puget. In determining this issue the case of *Dishman v. Whitney,* 121 Wash. 157, 162, 209 P. 12, 13, 29 A.L.R. 460 (1922) states:

> Where the facts presented are as consistent with the theory of agency as that of independent contractor, the burden is upon the one asserting the independency of the contractor to show the true relation of the parties.

Additionally, the "true relation" of the parties presents a question of fact for the jury. In *McGuire v. United States,* 349 F.2d 644 (9th Cir. 1965), the court stated at page 646:

> The determination of an individual's status as an employee or an independent contractor *is one of fact.*

(Italics ours.)

With this legal principle in mind, let us now examine the record to determine whether or not there was any evidence or inferences from such evidence from which the jury could determine the relationship between J & D and Puget to be

that of employer–employee rather than an independent contractor.

*Hollingbery v. Dunn,* 68 Wn.2d 75, 80, 411 P.2d 431, 435 (1966), is the controlling Washington case on the guidelines as to being an independent contractor or an employee:

In determining, in a given situation, whether one performs services for another as an employee or as an independent contractor, there are several factors or elements which should be taken into consideration. These are listed in Restatement (Second), Agency § 220(2) (1958), as follows:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

All of the factors listed are of varying importance in making the determination. With the exception of the element of control, however, it is not necessary that all remaining factors be present, for no one factor is conclusive and, in the final analysis, all directly or indirectly relate to, or inferentially bear upon, the crucial factor of control or right of control resident in the employer or principal. *Miles v. Pound Motor Co., supra* [10 Wn.2d 492, 117 P.2d 179 (1941)]. It is sufficient, then, if enough of the remaining factors are present, in favorable force, to permit an appropriate determination of whether or not

the employer or principal exercised or retained any right of control over the manner, method, and means by which the work involved was to be performed and the desired result was to be accomplished.

In *Massey v. Tube Art Display, Inc.*, 15 Wn. App. 782, 551 P.2d 1387 (1976), Tube Art Display, a sign company, hired a backhoe operator to dig a hole for the relocation of a sign. In performing the work he struck a small natural gas pipeline. Finding no indication of a break or leak, he left the site. The next day an explosion and fire occurred which was triggered by the broken pipeline, as a result of which two persons were killed and the contents of a building destroyed. The trial judge ruled that the backhoe operator, although supposedly an independent businessman, was an agent of Tube Art and the jury was so instructed, which resulted in a plaintiff's verdict.

On appeal, this court affirmed judgment and, at pages 787–88, found that the court properly instructed that the backhoe operator was an agent of Tube Art and stated:

It is the right to control another's physical conduct that is the essential and oftentimes decisive factor in establishing vicarious liability whether the person controlled is a servant or a nonservant agent. *McLean v. St. Regis Paper Co., supra* [6 Wn. App. 727, 496 P.2d 571 (1972)]; *Miles v. Pound Motor Co., supra.*

In discussing the actual extent to which the element of control must be exercised, we pointed out in *Jackson v. Standard Oil Co.*, 8 Wn. App. 83, 505 P.2d 139 (1972), that the plaintiff need not show that the principal controlled or had the right to control every aspect of the agent's operation in order to incur vicarious liability. Rather,

[i]t should be sufficient that plaintiff present substantial evidence of . . . control or right of control over those activities from whence the actionable negligence flowed. If the rule were otherwise, then a person wishing to accomplish a certain result through another could declare the other to be an independent contractor generally, and yet retain control over a particularly hazardous part of the undertaking without incurring liability for acts arising out of that part. Such a result

would effectively thwart the purpose of the rule of vicarious liability.

*Jackson v. Standard Oil Co., supra* at 91. *See also* Restatement (Second) of Agency § 220(1), comment *d* at 487 (1958). In the recent case of *Baxter v. Morningside, Inc.,* 10 Wn. App. 893, 521 P.2d 946 (1974), we stated at pages 895–96:

> In this regard, it may be emphasized that it is not de facto control nor actual exercise of a right to interfere with or direct the work which constitutes the test, but rather, the *right to control* the negligent actor's physical conduct in the performance of the service.

In *Massey* the appellate court upheld the agency relationship as a matter of law even though the backhoe operator had been essentially self–employed for about 5 years, was free to work for other contractors, selected the time of day to perform the work assigned, paid his own income and business taxes, and did not participate in any of Tube Art's employees' programs.

In the subject case J & D had no equipment of any kind other than the use of a truck when it submitted its bid to Puget. It is obvious that J & D had no wherewithal to carry out the task of refurbishing the pallets in its own right. Dan McInturff testified that he went down to see Puget's Thomas to bid on the job and he explained what had to be done. The following colloquy is enlightenment on the job he bid.

> He showed the steel that had to be blasted and painted and he asked for a bid (Thomas) . . . where they showed us what had to be blasted and painted. And in the vicinity where they wanted it done . . .

From that testimony the jury might well infer that J & D merely undertook the sandblasting and painting of the pallets and not the job of moving the pallets.

In order to consummate the refurbishing work it was necessary for Puget to (1) supply the forklift in an operable condition, (2) furnish a forklift operator or educate J & D on how to operate the forklift to do the work, (3) supply the zinc for the primer and all the paint and painting

materials, (4) furnish diesel fuel to operate the compressor, (5) furnish men to weld a hoist on the truck in order to enable J & D to pull the sand pot onto the premises, (6) supply stencils, and (7) use its forklifts operated by its personnel or instruct J & D personnel to carry the pallets some 25 to 100 feet over to the work area and to erect them for sandblasting.

In *Hollingbery,* it was stated at page 81:

in the final analysis, all directly or indirectly relate to, or inferentially bear upon, the crucial factor of control or right of control resident in the employer or principal.

The question the jury must determine is whether or not Puget exercised or retained any right of control over the manner, method and means by which the work involved was to be performed and the result to be accomplished. Evidence illustrating this control and/or right to control was:

1. The written bid of J & D (exhibit 10) provided that J & D would apply two epoxy finish coats *per the instructions of Puget* so it is clear that Puget retained control over how the epoxy was to be applied.

2. Puget retained control over the forklift and the forklift drivers, and its forklift drivers instructed J & D personnel on how to operate the forklift.

3. Puget controlled as to where the work was to be completed, designating a limited area on the dock where the work was to be accomplished. Puget had the right to transfer the work to another area of the dock, if it so desired.

4. Puget's employees brought the pallets by means of a forklift to the work area and after the pallets were sandblasted and painted they were taken back to another area for use.

5. Puget was in charge of Terminal 105 where the work was being done.

6. After a number of pallets were sandblasted and painted, Puget stopped the operation and required J & D to stencil the completed pallets before continuing on with the sandblasting and painting operation.

7. There was evidence that Puget inspected the pallets on an individual pallet–by–pallet basis. Puget's Thomas testified:

Q Did you inspect their work daily to see how it was coming along?

A I'd look at the pallet to see how well it was being blasted, you know. If I seen something I didn't like, I'd say, "Well, you will have to get that a little better." And when they first started on this, it was pretty much of a daily type thing, I'd look at it. Then as they got going and knew what I wanted, then I wouldn't have to look quite so often.

Q Did you inspect each and every pallet that had been finished to be sure that it was the way you wanted it?

A I don't believe I checked every one, but I spot checked them out.

8. Under the agreement Puget had the right to terminate any further work of J & D by merely paying J & D for the last pallet because there was no guarantee either in the written bid or by oral agreement between the parties that J & D would have the opportunity to sandblast all of the approximately 100 pallets.

9. Only Puget had the exclusive right to inspect the pallets on a day–to–day basis.

Q Was there anyone else charged with going down there and inspecting their work besides yourself?

A [Thomas] No, I didn't really delegate it to anybody.

Q So any inspections of the pallets that were done on behalf of Puget Sound were always done by you?

A At my satisfaction.

10. Puget's Thomas expressed displeasure to Dan McInturff about the speed of the operation and required J & D to hire two additional employees, and Sunco as well. Although J & D's McInturff testified that he subcontracted with Sunco for the cleaning of the pallets in order to speed up the job, the fact remains that Sunco operated a completely unsupervised second shift in the refurbishing process and was compensated directly from Puget on a piecework basis.

11. Puget summarily replaced J & D entirely in the operation after Franklin's death and designated Sunco to complete the sandblasting operation, without notice to J & D.

12. That during this same time sequel between April 15, 1974, to May 8, 1974, Puget directed J & D to perform other sandblasting jobs on the premises on a piece basis on Puget's equipment and barges at the terminal.

13. In a 6-week period the sand used in sandblasting the pallets accumulated on the dock from an original level of 1 or 2 inches up to nearly a foot on May 8, 1974, the date of the accident. Puget alone had a machine to remove such sand from the area and controlled the level of the accumulated used sand.

14. There was testimony by Thomas that if Puget had hired employees directly without a bid to do the same job that J & D employees did, the control exercised over those employees would have been no different than the control actually exercised over J & D in the present case.

15. Puget supplied the four-by-four and six-by-six pieces of lumber called dunnage used to brace the pallets when they rested on their sides preparatory to being sandblasted.

16. Puget was on the lookout for unsafe conditions. Thomas testified that he would walk around the area looking for possible hazards that might cause an accident or injury to person or property and if he observed anything, he would say something in order to try to prevent any occurrence of an accident.

17. Puget controlled the technique of propping pallets. Puget's Thomas testified that it wasn't a good practice to leave the pallets standing on their edges, although Puget sanctioned or permitted J & D and Sunco to continue to stand the pallets on their sides.

Q . . . *Did you at any time become concerned that one of these might fall down and injure somebody doing business with Puget Sound or somebody who had come onto the property at night?*

A *I had questioned Russom.*

Q Now, Russom, he wouldn't be involved until later.
A No, but I had questioned Russom as to how he secured them.
Q You did question Russom. And what was his response to that?
A He propped them.
Q He propped them?
A Using props, yeah.
Q Did he describe in any detail what type of props he used?
A No, wooden props is the only thing he'd say.
Q Why did you become concerned about this? Had you seen something out there?
A *No, it had just entered my mind that he would set them up that way and I said, "Well, if you got them up that way—"*
Q They could fall down?
A *"—how do you hold them up that way?"*
Q Were you satisfied that the bracing, when he said that they were bracing them, were you satisfied that this would be safe?
A Well, they've got an 18–inch—what did I say—16 inches here. That's a pretty good bearing if you keep them upright.
Q Well, if one of these had been stood upright—
A *On the flat ground, it's pretty stable.*
Q *—in the flat ground around where Puget Sound Tug & Barge employees were working, would you have let that remain that way?*
A *I doubt I would.*
Q *You doubt you would. Why is that?*
A *Because that's not a real good practice to leave things standing around up on their edge. It's not the proper way to stand them.*
Q Were you aware at any time whether these pallets were left standing on edge overnight when no one was working with them?
A No, I wasn't aware of that.

(Italics ours.)

We hold that there was substantial evidence in the record that Puget had retained control and/or the right to control part of J & D's operation for sandblasting and painting pallets. The issue of whether the relationship

between J & D and Puget was one of master and servant or independent contractor was a question of fact for the jury and not the court.

ISSUE 2: Was Puget a general contractor?

It is clear that the plaintiff would also be entitled to a new trial based on the recent Supreme Court case, *Kelley v. Howard S. Wright Constr. Co.*, 90 Wn.2d 323, 582 P.2d 500 (1978). In *Kelley* the plaintiff was an employee of a subcontractor on the construction of The Bank of California in Seattle. Kelley was required to work on a small platform at the fourth floor level of the building. In order to get out to bundles of decking panels, the workers were required to walk over bare beams which were slippery. The workers wore no safety belts or lifelines and there was no safety net in place below the platform where Kelley was working. On the day of his injury, Kelley walked towards the stack to get another panel when his feet slipped out from under him and he was pitched off the end of the platform headfirst and fell some 29 feet to the concrete floor below where he sustained crippling injuries.

The issue in *Kelley* was whether the general contractor had a duty of care to Kelley, an employee of a subcontractor, to provide a safe place to work.

■ Our Supreme Court, in a 9–to–0 decision written by Justice Horowitz, affirmed a jury award for the plaintiff by holding that the general contractor has a duty to provide a safe place to work to all employees in all common work areas of a construction project when its general supervisory functions include the right to control these work areas and the safety precautions to be taken with them. Justice Horowitz, on pages 330–32, 334 of the reported case, elucidates the general contractor's duty:

> The general rule at common law is that one who engages an independent contractor (here, a subcontractor) is not liable for injuries to employees of the independent contractor resulting from their work. *Fenimore v. Donald M. Drake Constr. Co.*, 87 Wn.2d 85, ·549 P.2d

483 (1976); *Larson v. American Bridge Co.,* 40 Wash. 224, 82 P. 294 (1905). *See also* W. Prosser, *Handbook of the Law of Torts* 468 (4th ed. 1971) (hereinafter referred to as Prosser); 2 Restatement (Second) of Torts § 409 (1965). Respondent contends that Wright had a duty to provide adequate safety precautions for the subcontractor's employees under exceptions to this general rule, and we agree. These exceptions are based in common law, statute, and contractual assumption of duty.

A common law exception to the general rule of nonliability exists where the employer of the independent contractor, the general contractor in this case, retains control over some part of the work. The general then has a duty, within the scope of that control, to provide a safe place of work. *Fenimore v. Donald M. Drake Constr. Co., supra. See also Greenleaf v. Puget Sound Bridge & Dredging Co.,* 58 Wn.2d 647, 364 P.2d 796 (1961); 2 Restatement (Second) of Torts § 414 (1965). The test of control is not the actual interference with the work of the subcontractor, but the right to exercise such control. *Fardig v. Reynolds,* 55 Wn.2d 540, 348 P.2d 661 (1960).

In this case Wright had a general supervisory and coordinating authority under its contract with the owner, not only for the work itself, but also for compliance with safety standards. Respondent maintains, and we agree, that Wright's general supervisory functions are sufficient to establish control over the work conditions of Robertson's employee Kelley. Wright had the right to require use of safety precautions such as lines or nets, or to halt dangerous work in adverse weather conditions. This authority alone was sufficient to establish appellant's duty to see that proper safety precautions were taken. In a case where the general contractor assumed by contract responsibilities for safety which were substantially the same as those assumed by Wright, the Fifth Circuit Court of Appeals found the general contractor retained sufficient control to establish liability for injuries to an employee of a subcontractor. *Smith v. United States,* 497 F.2d 500 (5th Cir. 1974).

. . .

. . . The area in which respondent Kelley's accident occurred was one in which four different contractors had worked within a short period of time. Wright had supervisory and coordinating authority over them all. We hold

appellant had a duty to see that proper safety precautions were taken in that area to provide the employees with a safe place of work.

Another ground for imposing a duty of care on Wright under the common law of tort is the inherently dangerous nature of the work respondent Kelley was doing. When work by its very nature creates some peculiar risk of injury, and the general contractor has reason to know of the inherent hazards of the work, the general contractor has a duty to take reasonable precautions against those hazards. 2 Restatement (Second) of Torts, *supra* at 427. *See also West v. Guy F. Atkinson Constr. Co.*, 251 Cal. App. 2d 296, 59 Cal. Rptr. 286 (1967). Work in which employees are required to walk over bare beams more than 25 feet above the ground, and sometimes even higher, is inherently dangerous. Wright was certainly aware of the hazards involved in such work, and therefore had a duty to take precautions against those hazards.

. . .

In summary, then, we hold appellant Wright had a duty to provide a reasonably safe place of work and reasonable safety equipment under the principles of the common law of tort, under RCW 49.16.030, and under Wright's contract with the owners. Failure to comply with this duty is the basis of appellant's liability to respondent Kelley.

Only that part of the opinion in *Kelley* establishing a duty in the general contractor, to provide a reasonably safe place of work and reliable safety equipment under the principles of the common law of tort applies to the subject case.

See also *Funk v. General Motors Corp.*, 392 Mich 91, 220 N.W.2d 641 (1974), where the Michigan court placed ultimate responsibility for job safety in all common work areas on the general contractor. The court in the Michigan case stated at page 104:

We regard it to be part of the business of a general contractor to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in

common work areas which create a high degree of risk to a significant number of workmen.

Applying the principles of *Kelley* to the subject case, it is clear there is substantial evidence as previously detailed earlier in this opinion from which the jury could find that Puget controlled or had the right to control part of the J & D operation as well as the entire general area where the work was being performed.

The next question is: Assuming the jury found Puget was the general contractor of the J & D operation on Puget's premises, was there any evidence that it failed to furnish the deceased with a safe place to work? The testimony of employee Jerry Dean was that 50 percent of the pallets were placed into work position on their sides by J & D employee McInturff, and the remaining 50 percent by employees of Puget. We do not know whether McInturff or an employee of Puget put up the particular pallet which fell on Franklin, but we do know that McInturff was not available at the time it was put into position for sandblasting, so presumably the placement of this particular pallet was done by employees of Puget. If so, the jury could find that Puget negligently placed the pallets on their sides without proper bracing, which caused the accident resulting in Franklin's death. If, in fact, the pallet had been placed by an employee of Sunco, the jury could also find that such employee was an employee of Puget, in view of the fact that Puget controlled Sunco's work similar to J & D, and also paid Sunco on a piecework basis, the same as J & D.

The jury could find Puget negligent in not removing used sand from the work area. As the sandblasting work progressed over approximately 3 weeks, the sand on the dock correspondingly increased from several inches up to nearly a foot and nothing was done to remove it. Neither J & D nor Sunco had the equipment to remove it but Puget did. Puget, by its failure to remove the used sand, caused it to pile up, and as a result pallets were placed on uneven sand rather than on the dock underneath the sand which undisputedly made the work extremely hazardous.

Puget's Thomas testified that he was well aware that it was not a safe practice to leave pallets on their sides without bracing. The jury had evidence before it that a safer and better practice was to brace the pallets by chains attached to the sides of the pallets, making it impossible for a pallet to fall on a workman while he was sandblasting. There was evidence that the bracing of the individual pallets, and particularly the one that fell on Franklin, was negligently done and that Puget failed to properly instruct J & D employees on bracing or provide for adequate bracing themselves. The jury could also find on this record that the duty of Puget to supply a forklift and a qualified forklift driver to put the pallets into a safe position for sandblasting was nondelegable and negligently done.

See also *Guy v. Northwest Bible College,* 64 Wn.2d 116, 390 P.2d 708 (1964), citing *Myers v. Little Church By The Side Of The Road,* 37 Wn.2d 897, 227 P.2d 165 (1951), where the court stated at page 119:

"The duty to furnish safe tools, machinery, appliances, and places for work is a positive, affirmative duty resting on the master, and cannot be delegated to another, or rather, cannot be delegated to another so as to relieve the master of his primary liability and the agency or person to whom the duty is attempted to be delegated is immaterial. This is true no matter how carefully the person or agency to whom the duty is attempted to be delegated is selected, or how competent or reputable he or it may be. . . ."

The Washington Administrative Code §§ 296–24–23025, mandates proper training of Puget's forklift drivers:

*Operator Training.* Only *trained* and *authorized* operators shall be permitted to operate a powered industrial truck. Methods shall be devised to train operators in the safe operation of powered industrial trucks.

(Italics ours.)

See *Massey v. Tube Art Display, Inc.,* 15 Wn. App. 782, 789, 551 P.2d 1387, 1392 (1976), wherein the court stated:

Assuming for the sake of argument that Redford acted as an independent contractor, this court does not accept

Tube Art's argument that its liability is, therefore, negated. This court is persuaded by the reasoning in *Hersum v. Kennebec Water Dist.*, 151 Me. 256, 117 A.2d 334, 53 A.L.R.2d 1072 (1955), one of the leading cases in this area. In *Hersum,* the defendant water company engaged the services of a backhoe operator for the laying of a new water main. The operator subsequently struck a gas pipe which, upon inspection, appeared to be undamaged. However, some time later a gas explosion occurred which, as the court found, was caused by a leaking gas pipe—the same pipe the backhoe operator struck. In deciding that the water district was liable for injuries caused by the explosion, the court said at page 268,

> Under the circumstances which were here present, *we think it makes no difference whether the operator of the power shovel was a servant and agent of the defendant or an independent contractor.* The defendant in any event was exercising control as to when and where the shovel should be used and how deep an excavation should be made with it. The apparent hazard to be anticipated from negligence was so great that the defendant could not avoid responsibility.

(Italics ours.)

The jury could also find that the operators of the forklifts used in moving pallets were not properly instructed on safety methods in their use, which failure was a concurring cause of the accident.

In summary, we hold that there was substantial evidence from which the jury could find that Puget acted as the general contractor overseeing the J & D painting and sandblasting operation and failed to provide the deceased Franklin with a safe place to work, causing his death.

ISSUE 3: Workmen's compensation law does not apply.

■ Defendant contends that even if decedent enjoyed the status of an employer–employee relationship, plaintiff would lack standing to bring this current action since her only recourse would be compensation funds pursuant to RCW 51.44. It is clear from the holding in *Fisher v. Seattle,* 62 Wn.2d 800, 806, 384 P.2d 852, 855 (1963), that where an employer–employee relationship exists under Washington's

workmen's compensation laws, no common–law remedies are available. However, the court directed that a determination of the status of employer–employee is based on the workman's consent. In *Fisher* the court stated at page 806:

> We hold that, in cases involving the issue whether under Washington's workmen's compensation laws there is an employer–employee relation, such a relation cannot exist without the consent of the workman.

In *Fisher,* the court stated there was no indication in the record that the workman had in any way consented to the employee relationship which was attempted to be established so as to bring the relationship under workmen's compensation.

In the subject case, the record does not disclose that the decedent consented to the employee relationship offered as a bar by Puget. Consequently we hold that Washington workmen's compensation law cannot bar plaintiff's cause of action.

Reversed and remanded for new trial.

ANDERSEN, A.C.J. (concurring in the result)—Subsequent to the trial court granting a challenge to the sufficiency of the plaintiff's evidence in this case, the State Supreme Court handed down its decision in *Kelley v. Howard S. Wright Constr. Co.,* 90 Wn.2d 323, 582 P.2d 500 (1978). Under the principles enunciated in *Kelley,* a jury issue is presented as to whether Puget Sound Tug and Barge Company breached a duty to the decedent, as an employee of an independent contractor, to provide him a safe place to work on Puget's premises where he was working at the time of his death.

RINGOLD, J. (concurring in the result)—I agree with Judge Andersen and therefore concur in the result.

Reconsideration denied December 21, 1978.