HARTFORD FIRE INSURANCE COMPANY, Plaintiff,

v.

**Tarrell LEAHY, et al., Defendants.**

**Case No. C10–0262JLR.**

United States District Court, W.D. Washington, at Seattle.

March 1, 2011.

Paul S. Smith, III, John Patrick Hayes, Matthew S. Adams, Forsberg & Umlauf, Seattle, WA, for Plaintiff.

Isaac Ruiz, William Candler Smart, Keller Rohrback, Seattle, WA, Steven Blaine Dixon, Port Orchard, WA, for Defendants.

## ORDER GRANTING HARTFORD'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS MOTION

JAMES L. ROBART, District Judge.

### I. INTRODUCTION

This matter is before the court on Plaintiff Hartford Insurance Company's ("Hartford") motion for partial summary judgment (Dkt. # 27), and Defendants Tarrell Leahy and Rick Zabel's cross motion for summary judgment (Dkt. # 35). The court has considered both motions, all submissions filed in support of and opposition to the motions, as well as all of the pleadings on file. In addition, the court heard the oral argument of counsel on February 25, 2011. For the reasons stated below, the court GRANTS Hartford's motion for summary judgment (Dkt. # 27), and DENIES Ms. Leahy's and Mr. Zabel's cross motion (Dkt. # 35).

## II. FACTUAL AND PROCEDURAL BACKGROUND

This is a declaratory judgment action in which Hartford seeks a declaration of its duties under a commercial general liability ("CGL") policy issued to its insured, Prudential Northwest Real Estate, LLC ("Prudential"). (Compl. (Dkt. # 1).) Hartford has moved for summary judgment declaring that Mr. Zabel is not an insured under the CGL policy at issue here because he was not an employee of Prudential, and that consequently Hartford owed no duty to defend Mr. Zabel in the underlying tort action, or any other policy benefit. (Mot. (Dkt. # 27) at 1.) On this basis, Hartford has also moved to dismiss on summary judgment Ms. Leahy's and Mr. Zabel's extra-contractual counterclaims for negligence, violation of Hartford's duties of good faith and fair dealing toward its insured under common law and RCW 48.01.030, estoppel and waiver of Hartford's contractual limitations of coverage or any policy limits, violation of the Washington State's insurance regulations, WAC 284–30–330, 350–380, violation of Washington's Consumer Protection Act ("CPA"), RCW ch. 19.86, and violation of Washington's Insurance Fair Conduct Act ("IFCA"), RCW 48.30.015. (Mot. at 1; Am. Counterclaims (Dkt. # 13) at 10–14.) Ms. Leahy and Mr. Zabel have responded and cross moved for partial summary judgment seeking a declaration that Hartford had a duty to defend Mr. Zabel in the underlying action, and that it breached that duty. (Resp. (Dkt. ## 32 & 35) at 1–2.) The material, undisputed facts are described below.

In the underlying tort action, Ms. Leahy alleged that while she was visiting her sister's home on December 24, 2006, she fractured her ankle when she stepped in a hole in the front yard. (Am. Counter-claims at 6.) Ms. Leahy alleged that the hole was left when a real estate signpost was removed by Mr. Zabel two months earlier. (*Id.*) On August 15, 2008, Ms. Leahy sued Prudential (the seller's listing broker), Judy Snyder (the seller's listing agent through Prudential), the homeowner (Ms. Leahy's sister), and Mr. Zabel, who alone installed and removed the signpost. (Ponci Decl. (Dkt. # 29) Ex. 2 (attaching complaint in underlying action).) The complaint Ms. Leahy filed alleged that Mr. Zabel was "the agent of the Prudential Defendants." (*Id.* Ex. 2 at ¶ 1.4.)

On April 28, 2009, Mr. Zabel provided sworn deposition testimony in the underlying tort action, as follows:

Q: ... Sir, what do you do for a living?

A: Install signposts for real estate agents.

Q: Do you have a company name?

A: Signs Exclusive

Q: And is this full-time work?

A: Yes.

\* \* \* \* \* \*

Q: ... Now, is that a sole proprietorship?

A: Yes.

Q: And how long have you owned that business?

A: Six years.

\* \* \* \* \* \*

Q: And have you always been the sole owner of that company? ....

A: Yes.

\* \* \* \* \* \*

Q: ... You mentioned earlier today that you believe you had approximately 300 or so customers back in October 2006.[1]

---

**1.** Mr. Zabel also testified in the underlying action that about 30 of his customers were

A: Yes.

Q: And you mentioned that there were people from different companies that you worked for; is that right?

A: Yes.

\* \* \* \* \* \*

Q: ... Now, given that you installed these signposts for real estate agents other than Prudential, other than agents who were affiliated with Prudential, I take it that Prudential was not your employer; is that correct? ...

A: That's correct.

Q: You had your own company; is that correct? ...

A: That's correct.

Q: ... And you basically were in business for yourself, right? ....

A: That's correct.

Q: ... So in terms of what you did during the day in terms of your physical movements, like going to a place and deciding how to use your work tools to make a hole and then to put a post in the hole, these were things that you did yourself; is that right? ....

A: Yes.

Q: ... In other words, nobody from Prudential accompanied you to the various locations that you went to for Prudential and were standing looking over your shoulder telling you how to dig a hole? ....

A: No.

Q: ... And these work tools that you used, even though there weren't that many of them, these were your work tools, were they not?

A: Yes.

\* \* \* \* \* \*

Q: And you've been doing this business since approximately when?

A: 2002.

Q: 2002. Do you get what they call a W–2 form from Prudential? ....

A: No.

Q: ... And back in 2005, 2006, did you get a W–2 form from Prudential in those years?

A: No.

Q: So you were responsible for your own taxes; is that correct?

A: Yes.

Q: If you got a bunch of faxes from different agents, as a hypothetical, if you got, say, ten faxes from agents asking you to install posts within a couple of days, would it be your choice or your decision-making as to the order in which you would go around and install those posts?

A: Yes.

Q: So basically you were in charge of your own daily schedule? ...

A: Yes.

Q: ... And you mentioned that you were trained by Don Ryan.

A: Yes.

Q: And somehow you got the business from him?

A: Yes.

Q: Was Don Ryan, to your knowledge, ever a direct employee of any of these real estate agents? ....

A: He owned the business before me, so I got all the customers from him.

Q: ... And it was an independent business that Don Ryan had? ....

A: Yes.

Prudential real-estate agents. (Adams Decl. (Dkt. # 28) Ex. 4 (attaching Zabel Decl.) at ¶ 2.) Thus, of Mr. Zabel's approximately 300 customers, only about ten percent were Prudential agents.

Q: ... So if any of these other attorneys were to try to say that Judy [Snyder] was your boss, would that be correct or incorrect? ....

A: Incorrect.

\* \* \* \* \* \*

Q: ... Was Judy Snyder ever your boss?

A: No.

Q: Were any of these other real estate agents that you have done work for since 2002, were they ever your boss?

A: No.

\* \* \* \* \* \*

Q: Sir, just because Judy Snyder contacts you and asks you to install a post or remove a post, do you consider that being the same thing as like her directing you as to how to actually do your physical work? ....

A: No.

(Adams Decl. Ex. 3 (attaching excerpts of Zabel Dep.) at 7–8, 68–74 (objections omitted; footnote added).)

On June 16, 2009, nearly ten months following the filing of Ms. Leahy's lawsuit, and two months after Mr. Zabel's deposition testimony above, counsel for Mr. Zabel tendered the lawsuit to Hartford seeking defense and indemnity for Mr. Zabel.[2] (Ponci Decl. (Dkt. # 29) Ex. 2.) The policy at issue is a Hartford Spectrum Business Insurance Policy. (Ruiz Decl. (Dkt. # 34), Ex. A.) Liability coverage includes damages an insured becomes liable to pay for bodily injury. (*Id.* at 65.) Under Section C.6.a. and f. of the policy, "Vendors" and "Any Other Party" "are additional insureds" if Prudential has "agreed, in a written contract, written agreement or because of a permit issued by a state or political subdivision, that such person or organization be added as an additional insured on [Prudential's] policy...." (*Id.* at 75–77.) Employees of Prudential are also insureds under the policy. (*Id.* at 74.)

Consistent with Mr. Zabel's foregoing testimony, Mr. Zabel's counsel did not assert that Mr. Zabel was Prudential's employee. Rather, Mr. Zabel's counsel stated that he believed that "Mr. Zabel [wa]s an insured under the policy as a 'vendor' and as 'any other party.'" (*See* Ponci Decl. (Dkt. # 29) Ex. 2.) On August 11, 2009, Hartford notified Mr. Zabel's counsel that it was denying coverage to Mr. Zabel and any tender of defense because Mr. Zabel did not qualify as a "vendor" or as "any other party" under Section C of the policy. (*Id.* Ex. 3.) Hartford explained that "a written contract or agreement between Prudential and Zabel does not exist," and therefore "Zabel does not qualify as an insured under The Hartford policy."[3] (*Id.*)

The insurers for Prudential, Ms. Snyder and Ms. Renfrew, including Hartford, settled the underlying tort claim with Ms. Leahy. (Am. Counterclaims at ¶ 10.) Mr. Zabel was the only remaining defendant, and he stipulated to a judgment in favor of Ms. Leahy for $2,750,000, along with a covenant not to execute the judgment except for any insurance benefits from Hartford that may be applicable under the policy described above. (Ruiz Decl. Ex. U.) The court in the underlying matter then held a reasonableness hearing con-

---

**2.** On May 19, 2009, counsel for Ms. Leahy, the plaintiff in the underlying action, also sent a letter purporting to tender the defense of Mr. Zabel in the underlying action to Hartford. (Ruiz Decl. (Dkt. # 37) Ex. B.).

**3.** Ms. Leahy and Mr. Zabel have abandoned these arguments in this coverage litigation. Neither have asserted before this court that Mr. Zabel qualified as either "a vendor" or as "any other person" under Section C of the policy.

cerning the settlement, and concluded that "the amount of $1,747,661.23 would be a reasonable settlement amount between Ms. Leahy and Mr. Zabel." (*Id.* Ex. U at 14.)

Following the reasonableness hearing in the underlying action, Hartford filed the present action seeking a declaratory judgment regarding its obligations to Mr. Zabel under the CGL policy at issue. Hartford has now moved for summary judgment on grounds that Mr. Zabel is not an employee of Prudential, and therefore not an insured to whom Hartford would owe a duty to defend or indemnify under the policy. Despite Mr. Zabel's sworn testimony in the underlying tort action to the contrary, Ms. Leahy and Mr. Zabel now assert for the first time that Mr. Zabel was in fact an employee of Prudential, that at a minimum there is a factual issue regarding his status, and that accordingly Hartford's motion should be denied. In addition, Ms. Leahy and Mr. Zabel cross move for partial summary judgment that, on the basis of Ms. Leahy's complaint in the underlying action, Hartford owed and breached its duty to defend Mr. Zabel in that litigation.

## III. ANALYSIS

### A. Summary Judgment Standards

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Galen v. County of Los Angeles,* 477 F.3d 652, 658 (9th Cir.2007). The moving party bears the initial burden of showing there is no material factual dispute and that he or she

is entitled to prevail as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If the moving party meets his or her burden, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Cline v. Indus. Maint. Eng'g. & Contracting Co.,* 200 F.3d 1223, 1229 (9th Cir.2000). In adjudicating cross-motions for summary judgment, the Ninth Circuit "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nevada v. City of Las Vegas,* 466 F.3d 784, 790–91 (9th Cir. 2006) (citations omitted); *see also Friends of Columbia Gorge, Inc. v. Schafer,* 624 F.Supp.2d 1253, 1263 (D.Or.2008).

### B. Hartford's Duty to Defend

Both Hartford and Defendants assert that the court may determine as a matter of law whether Hartford owed a duty to defend Mr. Zabel in Ms. Leahy's underlying tort lawsuit. (Mot. at 8 ("Based on the undisputed facts, Zabel does not qualify as an employee . . ., [and] has no policy coverage or claim against Hartford."); Resp. at 8 ("Does a genuine issue of material fact exist on the question whether Hartford owed Mr. Zabel a duty to defend? No.")), and indeed the court finds that the material facts at issue and described above are not in dispute. The parties' dispute centers instead on how the law should be applied to these undisputed facts—a province that belongs exclusively to the court.

#### 1. Hartford May Consider the Sworn Testimony of Mr. Zabel to Determine His Status as an Insured

 Plaintiffs assert that the law in Washington requires the court to look only to the underlying complaint to determine Hartford's duty to defend Mr. Zabel and no further. Indeed, Washington law in this arena is generally quite favorable to

insureds. As stated by the Washington Supreme Court:

> The rule regarding the duty to defend is well settled in Washington and is broader than the duty to indemnify .... The duty to defend arises at the time an action is first brought, and is based on *the potential for liability* .... An insurer has a duty to defend when a complaint against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured within the policy's coverage.... An insurer is not relieved of its duty to defend unless the claim alleged in the complaint is clearly not covered by the policy.... Moreover, if a complaint is ambiguous, a court will construe it liberally in favor of triggering the insurer's duty to defend.... In contrast, the duty to indemnify hinges on the insured's *actual liability* to the claimant and *actual coverage* under the policy. In sum, the duty to defend is triggered if the insurance policy conceivably covers the allegations in the complaint, whereas the duty to indemnify exists only if the policy *actually covers* the insured's liability.

*Woo v. Fireman's Fund Ins. Co.,* 161 Wash.2d 43, 164 P.3d 454, 459 (2007) (internal quotations, citations, and footnotes omitted; italics in original).

On the basis of this authority, Defendants assert that Ms. Leahy's underlying complaint, which alleges that Mr. Zabel "is the agent of the Prudential Defendants" (Ponci Decl. Ex. 2 at ¶ 1.4.), could be construed as describing Mr. Zabel as an employee of Prudential, and therefore an insured under Prudential's insurance policy to whom Hartford would owe a duty to defend. (Resp. at 18–19.) In fact, Mr. Zabel and Ms. Leahy go one step further—insisting (despite Mr. Zabel's unequivocal testimony to the contrary in the underlying action) that under Washington law Mr. Zabel is an employee of Prudential. (*Id.* at 10–13.) They argue that they have at least raised sufficient evidence to create a material issue of fact concerning Mr. Zabel's status as a Prudential employee to prevent summary judgment on that issue in Hartford's favor.

Hartford, however, insists that it can have no duty to defend a person or entity that is in fact not an insured under the policy. Hartford asserts that the authority above and Washington's generous application of the duty to defend only applies if the person or entity asserting coverage is, in fact, an insured. In support of its position, Hartford cites a prominent insurance law commentator:

> Before the general principle regarding the duty to defend applies, it must be shown that the person claiming coverage is, in fact, an insured. The insurer has imposed upon itself a contractual duty to defend its insured against suits alleging facts that, if proved, would constitute a risk insured against under the provision of the policy. It has not imposed upon itself a duty to defend a complete stranger to the contract.

Allan D. Windt, 1 *Insurance Claims & Disputes,* § 4.5 (5th ed. 2010). Hartford argues that because Mr. Zabel unequivocally testified in the underlying action, prior to tender of the claim, that he was neither Prudential's nor Ms. Snyder's employee, Mr. Zabel irrefutably was therefore not an insured under the policy and was therefore not entitled to a defense from Hartford.

Ms. Leahy and Mr. Zabel, however, assert that such an approach is foreclosed in Washington under *Holland America Ins. Co. v. Nat'l Indem. Co.,* 75 Wash.2d 909, 454 P.2d 383 (1969). They assert that *Holland America* must be construed to require a purported insured's status to be determined solely from the allegations of

the complaint in all circumstances where an insurer would deny coverage and not just the narrow circumstances at issue in *Holland America* involving automobile insurance. (*See* Resp. at 15–17.) *Holland America,* however, cannot be read as broadly as Ms. Leahy and Mr. Zabel propose. *Holland America* involved a dispute between two insurers over which insurer was required to pay defense costs to an omnibus driver under an automobile insurance policy. An omnibus driver is one driving the named insured's car with permission, and presents a unique situation not at issue in this case. Under Washington law, permissive users are required by law to be insured under the omnibus clause of the owner's auto insurance policy. *See* RCW 46.29.490(2)(b).

The *Holland America* court's definition of the issue before it, and its announced holding, are quite narrow and expressly apply only to situations involving omnibus drivers. The court states that the case

> ... presents for decision *a single question of law*—whether an insurer which has issued a policy of automobile liability insurance in obliged to defend a person who is not the named insured but is allegedly an insured under the omnibus clause.

454 P.2d at 383 (italics added). In announcing its holding, the court states that the rule that an insurer's duty to defend is to be determined from the allegations of the complaint "is ... appropriate when applied to suits against one allegedly driving with permission of the named insured...." *Id.* at 385. Thus, the *Holland America* court itself carefully circumscribed the sweep of its ruling and narrowly tailored its holding to situations involving permissive omnibus drivers.

Clearly, then, the *Holland America* decision cannot be divorced from this narrow factual context and the public policy concerns that were plainly at the forefront of the court's considerations. As the *Holland America* court specifically observed:

> The purpose of this statute [requiring permissive drivers to be insured under the omnibus clause of automobile liability insurance] is to protect persons injured as a result of the negligent use of a vehicle. It would be inimical to that purpose to subject such persons to the delay necessarily attendant upon the bringing of a declaratory judgment action to determine the right of a person allegedly driving with the permission of the owner, to be defended by the owner's insurer, or to put him to the expense of participating in such a proceeding.

454 P.2d at 386. There is no similar law or public policy requiring that an independent contractor or an employee be automatically insured under its principal's insurance policy. Furthermore, the court has found no other reported Washington case outside the automobile insurance context holding that one who is not an insured under the policy is entitled to a defense.

In addition, the facts surrounding the tender of this matter to Hartford also distinguish it from *Holland America.* There is no suggestion in *Holland America* that the tender of defense occurred in anything other than the usual manner—early in the underlying litigation, and relatively soon following the filing or service of a complaint. Here, however, Mr. Zabel did not tender his defense to Hartford until near the end of the underlying litigation and after he (and others) had provided sworn deposition testimony. The significance of this distinguishing fact becomes clear when one considers the *Holland America* court's discussion of *Smith v. Ins. Co. of the State of Penn.,* 161 So.2d 903 (La.Ct. App.1964). The *Holland America* court noted that *Smith* recognized the general

rule but nevertheless allowed the insurance company to escape liability where it successfully urged that no permission was granted. *Holland America,* 454 P.2d at 385–86. The *Holland America* court rejected the *Smith* ruling as applied to facts involving the early tender of defense of an omnibus driver. However, the *Holland America* court noted that *Smith* "was decided after the damage action had been litigated," and "did not explain how the rule which [the *Smith* court] adopted could be applied at the time the complaint was filed, when fact questions have not been determined." 454 P.2d at 386. Thus, while the *Holland America* court could not reconcile the rule in *Smith* to the facts it confronted involving an early tender, 454 P.2d at 386, this court, which is faced with facts involving a tender at or near the end of litigation, finds the *Holland America*

court's notation of this distinguishing factor to be significant. Accordingly, this court cannot conclude that *Holland America*'s circumscribed ruling precludes the carrier or this court from considering Mr. Zabel's sworn testimony in the underlying tort action here, which unequivocally precludes a finding that he is an insured under the policy.[4]

Indeed, contrary to Mr. Zabel and Ms. Leahy's assertions, at least one Washington court has examined extrinsic evidence, in addition to the allegations in the underlying complaint, to determine that a carrier did not owe a duty to defend because the purported insured was in fact not an insured under the policy. In *Scottish & York Int'l Ins. Group v. Ensign Ins. Co.,* 42 Wash.App. 158, 709 P.2d 397 (1985), Benton County was an additional insured under the TriCities Water Follies' ("Water

---

4. Ms. Leahy and Mr. Zabel also point to *Black v. Grange Ins. Assoc.,* No. C08–1699Z, 2009 WL 4110300 (W.D.Wash. Nov. 19, 2009). In *Black,* the policy of the named insured provided coverage for "volunteer workers only while performing duties related to ... farming, or ... farm employees ..., but only for acts within the scope of their employment ... while performing duties related to ... farming." *Id.* at *8. The alleged insureds tendered their defense to the carrier near the onset of the litigation. The court found that the detailed complaint "allege[d] numerous facts that can be construed to assert that [the plaintiff's] injuries arose from the negligence of [defendants] in operating the [named insured's] horse farm." *Id.* at *8–*9. The court rejected the carrier's assertion that there was no allegation that the plaintiff was injured when the defendants were engaged in "farming activities" or that the horse training program operated by the defendants could "not be construed as an agricultural ... enterprise to qualify as farming in order for ... coverage to apply." *Id.* at *8. The court further rejected the carrier's attempt to weigh all of these allegations and come to a "unilateral determination" that the defendants were not "volunteer workers" or "farm employees" and therefore insureds under the terms of the policy. *Id.*

The facts of *Black* are distinct from the situation at hand. First, unlike the carrier in *Black,* Hartford did not sift through, parse, and weigh the various detailed allegations and extrinsic evidence at the outset of the litigation to determine whether or not Mr. Zabel was an employee and therefore an insured under the policy. Unlike the detailed allegations in the underlying complaint in *Black,* the allegations here were exceedingly sparse. (*See* Ponci Decl. Ex. 2 (attaching complaint in underlying action).) Indeed, the only allegations specifically identifying Mr. Zabel simply stated that he was "the agent of the Prudential Defendants." (*Id.,* Ex. 2 at ¶ 1.4.) More importantly, in *Black* there was an early tender of defense to the carrier, and no indication that any significant court rulings or discovery had occurred in the underlying tort action at the time of tender. *Id.* at *2 (indicating that tender occurred approximately two months following the filing of the complaint). As noted above, Mr. Zabel did not tender his defense to Hartford until late in the underlying litigation, after Mr. Zabel had already provided unequivocal, straight-forward, sworn testimony in the underlying litigation foreclosing the possibility that he was an insured under the policy. The facts in *Black* are simply too disparate for the court to find them particularly applicable here.

Follies") policy, but Benton County's status as an additional insured was limited "to operations performed by or on behalf of the named insured." *Id.* at 397. The underlying complaint alleged that (1) the Water Follies had subleased a recreational area on the Columbia River from Benton County, (2) the plaintiff had been injured, resulting in quadriplegia, following a dive into the Columbia River at a place allowed for swimming, and (3) the defendants had failed to maintain the property in a reasonably safe condition for swimming, and had failed to post or warn regarding the hazards of swimming. *Id.* at 398. If the Scottish & York court subscribed to Mr. Zabel's and Ms. Leahy's interpretation of Washington law, then these specific allegations of negligence in allowing an unsafe condition for swimming is all the court should have considered in ruling that the insurer did not owed a defense to by the insured.

The *Scottish & York* court, however, looked beyond the bare allegations of the complaint—to the nature of Water Follies's operation and the lease between Benton County and the Water Follies—to determine Benton County's status as an insured, and thus the insurance carrier's duty to defend. Specifically, the court noted:

> There are no facts alleged in [the] complaint indicating the injuries arose because of negligence with respect to operations performed by or on behalf of the Water Follies. The allegations of negligence are based on the failure to maintain the river or shore in a reasonably safe condition for swimming or to post or otherwise warn of hazards. *These allegations are unrelated to the operations, activities, and programs of Water Follies. Swimming in the river was not an activity or operation of the Water*

> *Follies. Further, the lease made no reference to allowing or sanctioning swimming in the Columbia River.*

*Id.* at 399 (emphasis added). The underlying complaint contained no allegations describing Water Follies' operations or activities, or referenced any lease provisions. *See id.* at 398. Yet, the court examined not only the lease provisions, but also the nature of Water Follies' operations, and its duty to maintain the riverbank or shoreline in a condition safe for swimming. The court necessarily looked beyond the bare allegations of the complaint and analyzed these extrinsic facts to determine that Benton County was not an insured under the policy, and that the insurer therefore had no duty to defend. If the court in *Scottish & York* could consider the terms of the lease between Benton County and Water Follies, as well as details of Water Follies' operations, then surely consideration of Mr. Zabel's sworn unequivocal testimony in the underlying tort action that he was not an employee of Prudential's agent is also fair game. *See also Am. States Ins. Co. v. First Financial Ins. Co.,* 332 Fed.Appx. 427, 427 (9th Cir.2009) (Unpub. Disp.) ("Following its investigation of these readily ascertainable [extrinsic] facts, [the insurer] correctly determined it did not owe [the insured] a duty to defend.") (citing *Truck Ins. Exchange v. Vanport Homes, Inc.,* 147 Wash.2d 751, 58 P.3d 276, 282 (2002)).

**2. Judicial Estoppel Precludes Mr. Zabel's Assertion that He is a Prudential Employee**

 Further, the court finds that Mr. Zabel's position in this coverage litigation that he is an employee of Prudential is foreclosed on the basis of judicial estoppel.[5] Judicial estoppel, sometimes known

---

**5.** A party may invoke the doctrine of judicial

estoppel in a motion for summary judgment

as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position. *Rissetto v. Plumbers and Steamfitters Local 343,* 94 F.3d 597, 600 (9th Cir.1996). Judicial estoppel is applied "because of 'general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings,' and to 'protect against a litigant playing fast and loose with the courts.'" *Hamilton v. State Farm Fire & Cas. Co.,* 270 F.3d 778, 782 (9th Cir.2001) (quoting *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990)). Judicial estoppel applies to a party's stated position whether it is an expression of intention, statement of fact, or a legal assertion. *Wagner v. Prof'l Eng'rs in Cal. Gov't,* 354 F.3d 1036, 1044 (9th Cir.2004).

The Supreme Court has established certain factors that district courts may take into consideration when deciding whether judicial estoppel is appropriate in a given case: (1) whether the party's later position is "clearly inconsistent" with its earlier position; (2) whether the party has successfully advanced the earlier position, such that judicial acceptance of an inconsistent position in the later proceeding would create a perception that either the first or the second court had been misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose unfair detriment on the opposing party if not estopped. *New Hampshire v. Maine,* 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). The Supreme Court further noted, however, that the doctrine is "probably not reducible to any general formulation of principle," and that by enumerating the factors to be considered, the Court did "not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *Id.* "Additional considerations may inform the doctrine's application in specific factual contexts." *Id.* at 751, 121 S.Ct. 1808.

The court finds that factors one and three are met. The analysis is straightforward. Mr. Zabel's position in this litigation—that he is an employee of Prudential (Resp. at 8–13)—is in direct contravention with his sworn testimony in the underlying tort action—that he owned his own business and was not an employee of Prudential (Adams Decl. Ex. 3 at 7–8, 68–74). Further, by asserting such a contrary position in this litigation, Mr. Zabel and Ms. Leahy would certainly impose an unfair detriment on Hartford. They would impose the duty to defend on Hartford for Mr. Zabel as an employee of Prudential, although this duty would be in conflict with Mr. Zabel's sworn testimony, and then also assert that Hartford was in bad faith for finding, consistent with Mr. Zabel's sworn testimony in the underlying tort action, that he was not an additional insured under the policy.

The analysis of factor two is more complicated. The Ninth Circuit has stated that the doctrine of judicial estoppel is

to bar a claim based on an inconsistent position. *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.,* 568 F.Supp.2d 1152, 1165 (C.D.Cal.2008) (citing *Elston v. Westport Ins. Co.,* 253 Fed.Appx. 697, 699 (9th Cir.2007) (Unpub. Disp.) (affirming district court's grant of summary judgment on the basis that plaintiff's claims were barred by judicial estoppel)). A party seeking to defeat summary judgment on judicial estoppel grounds must "sufficiently explain" a prior inconsistent position to defeat summary judgment. *See, e.g., Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (stating that a party must "provide a sufficient explanation" for a prior inconsistent statement to defeat summary judgment).

restricted "to cases where the court relied on, or 'accepted' the party's previous inconsistent position." *Hamilton*, 270 F.3d at 783 (citing *Interstate Fire & Cas. Co. v. Underwriters at Lloyd's, London*, 139 F.3d 1234, 1239 (9th Cir.1998); *Masayesva v. Hale*, 118 F.3d 1371, 1382 (9th Cir.1997)). Here, Mr. Zabel's deposition testimony was specifically placed before the underlying court in the context of Prudential's and Ms. Snyder's motion for summary judgment. (Ruiz Decl. Ex. L at 3–9.) However, the underlying action was settled prior to the court's determination of Mr. Zabel's status as an employee on summary judgment, and thus arguably there is no antecedent judicial acceptance of Mr. Zabel's former position.

Nevertheless, there are exceptions to the Ninth Circuit's strict application of factor two. For example, the Ninth Circuit has found that a favorable settlement constitutes judicial acceptance or reliance. *See Rissetto*, 94 F.3d at 604–05. Here, Mr. Zabel did obtain a favorable settlement from Ms. Leahy. The Stipulated Judgment, Settlement Agreement, and Covenant Not to Execute ("Settlement Agreement") between Ms. Leahy and Mr. Zabel specifically states that one of its purposes is "to protect the assets, earnings, and personal liability of [Mr. Zabel] from claims by [Ms. Leahy] that might result in a multi-million dollar excess verdict." (Adams Decl., Ex. 1 at 2.) In the Settlement Agreement, Mr. Zabel admits that he would be found liable at trial and would lose a motion for summary judgment. (*Id.* at 4.) On this basis, he agrees to the entry of a judgment against him and in favor of Ms. Leahy. (*Id.* at 6.) Nevertheless, Mr. Zabel was able to obtain a covenant from Ms. Leahy that she "will never execute upon or attempt to enforce any judgment against the assets of [Mr. Zabel] beyond the insurance assets [assigned to Ms. Leahy by Mr. Zabel, includ-

ing claims against Hartford]." *Id.* at 6–7. In light of Mr. Zabel's admission of liability, a settlement agreement that protects all of his personal assets, except for any potential insurance claim he might have, must be considered favorable. Further, after conducting a hearing, the court in the underlying action entered findings of fact and conclusions of law regarding the reasonableness of the settlement between Ms. Leahy and Mr. Zabel (Ruiz Decl. Ex. V), and entered judgment on the basis of that hearing and ruling (*see id.* Ex. W). In evaluating issues surrounding the second factor, the Ninth Circuit has found that persons who obtain favorable settlements "have 'prevailed' as surely as persons who induce the judge to grant summary judgment." *Rissetto*, 94 F.3d at 605 (quoting *Kale v. Obuchowski*, 985 F.2d 360, 362 (7th Cir.1993).) Thus, the court finds, on the basis of the factual circumstances here, that factor two has been satisfied.

In addition, at least one district court in this circuit has found that a party may be judicially estopped, even if a previous tribunal did not rely upon his first position, if the party is now playing "fast and loose" with the court. *Gagne v. Zodiac Maritime Agencies, Ltd.*, 274 F.Supp.2d 1144, 1148 (S.D.Cal.2003) (citing *Gen. Signal Corp. v. MCI Telecom. Corp.*, 66 F.3d 1500, 1505 (9th Cir.1995)). This exception, however, requires more than mere indirect or implied inconsistency. *Id.* Assuming this exception is valid, the court finds that it is satisfied here. Although the court in the underlying action found an amount over $1.7 million to be a reasonable settlement, Ms. Leahy cannot tap into Hartford's insurance proceeds in order to satisfy that amount unless Mr. Zabel asserts a position before this court (that Mr. Zabel is an employee of Prudential) that is 180 degrees contrary to the position to which Mr. Zabel swore under oath in the under-

lying case (that Mr. Zabel was not an employee). The court finds that this factual scenario smacks of possible collusion between the settling parties in the underlying litigation, and is precisely the type of circumstances in which a court may in its discretion invoke judicial estoppel in order to protect against a litigant playing "fast and loose" with the judicial process. Allowing Mr. Zabel to take a position before this court that is so brazenly contrary to his sworn testimony in the underlying litigation would certainly create the perception that one of the courts had been misled.

The court finds the facts of this case to be similar to *Burns v. Scottsdale Ins. Co.,* No. C08–1136RSL, 2010 WL 2947345 (W.D.Wash. July 23, 2010). In *Burns,* the plaintiff was injured and disfigured when she contracted a life-threatening infection of "flesh-eating" bacteria following a tongue-piercing. *Id.* at *1. She sued the company that performed the tongue-piercing, along with its owners, Mr. and Mrs. Burns. *Id.* The plaintiff argued in the coverage action that her underlying second amended complaint included allegations that could subject Mr. Burns to personal liability, and that under this theory, the carrier owed Mr. Burns a duty to defend. *Id.* at *5. However, in her motion to amend, the plaintiff had stated that she was adding the Burnses "in their capacity as the sole owners of Painless Steel Everett LLC, not as individuals subject to personal liability." *Id.* at *2. In rejecting coverage based on the personal liability theory, the court stated:

> [I]n the underlying litigation, [the plaintiff] explicitly and unequivocally stated that she was not suing the Burnses "as individuals subject to personal liability." ... [The plaintiff] is bound by that representation. *See e.g., Ashmore v. Estate of Duff,* 165 Wash.2d 948, 951, 205 P.3d

111 (2009) (explaining that judicial estoppel "prevents a party from asserting one position in a judicial proceeding and later taking an inconsistent position to gain an advantage.").... Scottsdale was not required to ignore [the plaintiff's] clear representation to the court and defend against a claim she explicitly disavowed.

*Id.* at *5. Here, too, Hartford is not required to defend Mr. Zabel as an employee of Prudential, and thus an insured, in the face of explicit and unequivocal sworn testimony that he was not an employee of Prudential or its agents.

### 3. Mr. Zabel is Not an Employee as a Matter of Law

■ Ms. Leahy and Mr. Zabel nevertheless assert that the court should ignore Mr. Zabel's prior testimony that he was not an employee of Prudential because Washington law ignores such labels and relies instead upon a multifactor test from the Restatement (Second) of Agency § 220(2). (*See* Resp. at 10.) Hartford counters that even under the exacting elements of this test, Mr. Leahy is still not an employee of Prudential. The court agrees.

■ The material facts concerning the nature of Mr. Zabel's work and his relationship to Prudential and its agent, Ms. Snyder are undisputed. Where the material facts are undisputed, the determination that an individual is an independent contractor is a question of law:

> If the facts are undisputed and but a single conclusion may be drawn therefrom, it becomes a question of law as to whether one is an employee or an independent contractor.

*Bloedel Timberlands Dev., Inc. v. Timber Industries, Inc.,* 28 Wash.App. 669, 626

P.2d 30, 33 (1981).[6]

In *Miles v. Pound Motor Co.*, the Washington Supreme Court defined an independent contractor:

> [A]n independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods and without being subject to the control of his employer as to the means by which the result is accomplished, but only as to the result of the work.

10 Wash.2d 492, 117 P.2d 179, 182 (1941). Thus, the Court established that control over the means, as opposed to the result of the individual's work, was central to the determination.

In *Massey v. Tube Art Display, Inc.*, 15 Wash.App. 782, 551 P.2d 1387, 1390 (1976), the Washington Court of Appeals identified ten factors, found in section 220(2) of the Restatement (Second) of Agency, for determining the status of a worker as either an employee or an independent contractor. Those factors include: (a) the extent of control which, by the agreement, the master may exercise over the details of the work, (b) whether or not the one employed is engaged in a distinct occupation or business, (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision, (d) the skill required in the particular occupation, (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work, (f) the length of time for which the person is employed, (g) the method of payment, whether by time or by the job, (h) whether the work is part of a regular business of the employer, (i) whether or not the parties believe they are creating the relation of master and servant, and (j) whether the principal is or is not in business. *Id.* The *Tube Art* court found that all of these factors are of varying degrees of importance, and (with the exception of the element of control) not all need be present. *Id.* However, similar to the *Miles* court, the *Tube Art* court found that "[i]t is the right to control another's physical conduct that is the essential and oftentimes decisive factor in establishing ... whether the person controlled is a servant or nonservant agent." *Id.*[7]

**6.** Ms. Leahy and Mr. Zabel assert that a jury question exists where "facts as to the agreement between the parties ... are in dispute or are susceptible to more than one interpretation or conclusion." (Resp. at 9.) The court agrees with Defendants' statement of the law. However, Defendants fail to cite any specific material factual dispute that bears upon the issues. While the parties may be in dispute about how the multifactor test applies to the facts at hand (a province that is exclusively the court's), the court could find no material factual dispute preventing the entry of summary judgment on this issue.

**7.** The parties agree that the *Tube Art* factors are the correct test to apply here. (*See* Mot. at 15–16; Resp. at 8–13.) However, Mr. Zabel and Ms. Leahy go one step further asserting that the outcome of the decision in *Tube Art*, that a back hoe operator was an employee rather than an independent contractor, is controlling here. The court disagrees. Although *Tube Art* also involved the digging of a hole by a purported independent contractor, the similarities with this case end there. The undisputed evidence here establishes that neither Ms. Snyder nor Prudential controlled how Mr. Zabel dug the holes for his posts, secured the posts in the holes, or filled his holes once the post was no longer needed. An agent would simply ask Mr. Zabel to place a post at a particular address, sometimes noting the location more specifically with a red flag, and ask him to remove a particular post when it was no longer needed. These types of instructions, while indicative of control with regard to the result of Mr. Zabel's work, are not indicative of controlling the means of his work. As noted by the *Miles* court, it is control over the means rather than result that is determinative with regard to employment

With these foregoing factors and principles in mind, the court turns to the undisputed material facts at hand. Mr. Zabel is a sole proprietor who owns his own business, called Signs Exclusive. (Adams Decl., Ex. 3 at 7–8, 49, 68.) He installs and removes signposts for more than 300 different real estate agents representing a number of different real estate companies. (*Id.*) Mr. Zabel purchased his business in 2002 from Mr. Don Ryan, who also provided Mr. Zabel training for the business. (*Id.* at 17–18, 10–11.)

Mr. Zabel charges real estate agents a fixed $29 fee for each sign installation and removal. (*Id.* at 10.) Mr. Zabel owns the signposts that he installs upon which the realtor's sign is hung, and maintains his own storage building for both posts and signs. (*Id.* at 19.) He owns his own tools. (*Id.* at 70.) When Mr. Zabel removes a signpost, he fills the hole with dirt he purchases and stores in his own backyard. (*Id.* at 15–16, 64–65.) He pays his own taxes, and sets his own daily schedule. (*Id.* at 71.)

Of the 160 signposts he installed or removed in October 2006, only approximately ten were for Prudential. (*Id.* at 68.) Of his approximately 300 customers (*id.* at 49), only about 30 were Prudential agents (Adams Decl. Ex. 4 at ¶ 2). Ms. Snyder has never installed or removed a signpost. (Snyder Decl. (Dkt. # 30) ¶ 6.) Neither Ms. Snyder, nor Mr. Morrow, the former broker for Prudential, have been trained in the proper procedures for installing signposts, nor do they know what those procedures are. (*Id.* at ¶ 7; Morrow Decl. (Dkt. # 31) ¶ 7.) Further, as recounted in detail above, Mr. Zabel believes that he is an independent business owner, and not the employee of Ms. Snyder or Prudential. (Adams Decl. Ex. 3 at 8, 68–69, 72.) Further, Prudential does not believe that Mr. Zabel is its employee either. (Morrow Decl. at 1.)

When realtors retain Mr. Zabel to install a signpost, they either call or send him a facsimile to provide him with an address where the post is to be installed. (*Id.* at 10.) Some agents use a red flag to designate where they would like Mr. Zabel to place the signpost, but Ms. Snyder did not. (*Id.* at 13, 23–24, 46–47.) If there is no red flag, then Mr. Zabel uses his discretion to locate the signpost. (*Id.* at 23.) In this case, it is undisputed that Mr. Zabel chose the signpost location and all other installation and removal methods, receiving no instructions from Ms. Snyder or Prudential with regard to how the signpost was installed or removed. (*Id.* at 23–24, 46–47.)

It is undisputed that the physical process of installing and removing signposts, how to use his tools, how to dig a hole, or how to fill an empty hole, were entirely controlled by Mr. Zabel, and not Prudential or Ms. Snyder. (*Id.* at 46–47, 52–53, 69.) Indeed, both Ms. Snyder and Prudential's former principal, testified that they never gave Mr. Zabel specific instruction, nor retained control over the manner in which Mr. Zabel installed or removed signposts, except to identify the property upon which the signpost was to be install-

status. 117 P.2d at 182. In contrast, the employer in *Tube Art* controlled "all of the discretionary work that was necessary before [the worker] started to operate." 551 P.2d at 1391. The employer selected "the method of excavation", "the dimensions" of the hole, and "got the building permit." *Id.* Further, the operator in *Tube Art* worked almost exclu-

sively for the employer, devoting ninety percent of his time to Tube Art. *Id.* Here, by way of contrast, Mr. Zabel has over 300 clients, and only approximately 30 are Prudential agents. While the factors identified in *Tube Art* are applicable here for determining Mr. Zabel's employed status, the facts and outcome of *Tube Art* are not controlling.

ed, as well as the date by which the post was to be installed and removed. (Morrow Decl. at ¶¶ 8–9; Snyder Decl. at ¶¶ 8–9.) Based on the foregoing undisputed facts, the court finds that the factors set forth in the Restatement (Second) of Agency overwhelmingly favor finding that Mr. Zabel was not an employee of Prudential. Indeed, this is the only reasonable conclusion based on the undisputed facts above.

The undisputed facts asserted by Defendants in response do not alter the court's legal conclusion that Mr. Zabel is not an employee of Prudential. Defendants assert that Mr. Zabel was not required to be certified in his line of work. (Resp. at 4.) Defendants assert that Prudential owned the actual signs that were placed on Mr. Zabel's posts. (*Id.* at 3.) Neither of these facts render Mr. Zabel a Prudential employee. Except for the actual signs, which would obviously change depending on the agent or agency with whom Mr. Zabel was contracting, the post, the tools, and the dirt he utilizes in his business are all owned by him.

Defendants also assert that Prudential retained control over the location of the signs, whether or not it exercised that control here, as well as when to put up and take down the signs. (*Id.* at 3–4.) The Washington Supreme Court has stated that control of the result of the work, as opposed to the means of the work, is consistent with the status of an independent contractor. *See Miles,* 117 P.2d at 182. The type of control described by Defendants regards only the result of the work (location and timing), and not the means (how the hole is actually dug, the post secured in the hole, and the hole eventually filled), and thus does not alter the court's determination that Mr. Zabel was an independent contractor.

Finally, Defendants also point to testimony that Ms. Snyder told Mr. Zabel to fill the hole after the injury in the underlying action had occurred. However, under Washington law, retention of the right to oversee compliance with the contract or to inspect and insure proper completion of the contract does not vitiate the independent contractor relationship. *Kamla v. Space Needle,* 147 Wash.2d 114, 52 P.3d 472, 475 (2002). Thus, the court finds that the undisputed, material facts establish that Mr. Zabel was not an employee of Prudential as a matter of law.

Mr. Zabel testified in the underlying litigation that he was not an employee of Prudential. Under the factual circumstances here, Washington law requires neither Hartford, nor this court, to ignore Mr. Zabel's express sworn testimony in the underlying action, which bears directly on his status as an additional insured and is diametrically contrary to his position in this coverage litigation. Further, the court finds that Mr. Zabel is judicially estopped from asserting otherwise in this litigation. The court also finds that under the factors set forth in the Restatement (Second) of Agency § 220(2), as well as the material undisputed facts presented to the court, Mr. Zabel is not an employee of Prudential, but an independent contractor as a matter of law. Because Mr. Zabel was not an employee of Prudential, Mr. Zabel was not an insured under Hartford's policy with Prudential, and therefore Hartford did not owe Mr. Zabel a duty to defend, or any other policy benefit.

## C. Summary Judgment is Appropriate with Regard to Defendants' ExtraContractual Claims

Ms. Leahy and Mr. Zabel have cross-claimed for bad faith. (Am. Counterclaims ¶¶ 7.1–7.2.) Under Washington law, a bad faith claim may only be brought by an insured under the policy. As the

Washington Supreme Court stated in *Tank v. State Farm Fire & Cas. Co.:*

> The duty to act in good faith or liability for acting in bad faith generally refers to the same obligation.... Indeed, we have used those terms interchangeably.... However, regardless of whether a good faith duty in the realm of insurance is cast in the affirmative or the negative, the source of the duty is the same. That source is the fiduciary relationship existing between the insurer and the insured. Such a relationship exists not only as a result of the contract between the insurer and insured, but because the high stakes involved for both parties to an insurance contract and the elevated level of trust underlying insureds' dependence on their insurers.

105 Wash.2d 381, 715 P.2d 1133, 1136 (1986). The duty to act in good faith is thus premised upon the insurer/insured relationship. Indeed, the Washington Supreme Court has specifically held that a third party may not bring a bad faith claim.

> We hold that third party claimants may not sue an insurance company directly for an alleged breach of good faith under a liability policy.

*Id.* at 1139. The court has found that Mr. Zabel was not an insured under the policy. Therefore, he has no claim for bad faith. Because he has no right to assert a claim for bad faith against Hartford, neither does Ms. Leahy who merely stands in his shoes by way of assignment.

■ For similar reasons, Mr. Zabel's and Ms. Leahy's claim for negligence (Am. Counterclaims ¶¶ 5.1–5.2) also fails. Negligence requires the existence of a duty to the complaining party. *See Hansen v. Wash. Natural Gas Co.,* 95 Wash.2d 773, 632 P.2d 504, 505 (1981). Because Mr.

Zabel is not an insured, Hartford owed him no duty of care.

Defendants have counterclaimed for breach of the duty to defend and for estoppel. (Am. Counterclaims ¶¶ 6.1–6.3; 10.1–10.3.) Because the court has ruled that Hartford owed no duty to defend Mr. Zabel, Defendants' counterclaim for a breach of this duty must fail. Likewise, while estoppel is an appropriate remedy for bad faith breach of the duty to defend, *see Safeco Ins. Co. v. Butler,* 118 Wash.2d 383, 823 P.2d 499, 506 (1992), Hartford did not breach its duty to defend because Mr. Zabel was not an insured.

■ Defendants have also counterclaimed for violation of various Washington Administrative Code ("WAC") sections relating to insurance. (Am. Counterclaims ¶¶ 4.1–4.7.) However, under Washington law, strangers to the insurance policy have no cause of action for violation of the WACs. As stated in *Tank,*

> Pursuant to authority under RCW 48.30.010, the Insurance Commissioner developed comprehensive unfair practice regulations.... These rules are found in WAC 284-30-300 through 600. They generally set forth certain minimum standards which, if violated with such frequency as to indicate a general business practice, will be deemed to constitute unfair claims settlement practices.

> Nothing in the language of these regulations specifically gives third party claimants the right to enforce the rules. Moreover, we are not persuaded that it was the intent of the Insurance Commissioner in drafting these regulations to create a cause of action in third party claimants. The enforcement of these rules on behalf of third parties should be the province of the Insurance Commissioner, not individual third party claimants.

715 P.2d at 1140. Neither Mr. Zabel nor Ms. Leahy are parties to the insurance contract. They, therefore, have no cause of action against Hartford for violation of these WAC provisions.

 Further, because Mr. Zabel is not an insured under the policy, neither he nor his assignee, Ms. Leahy, may pursue a counterclaim under the Consumer Protection Act (Am. Counterclaim ¶¶ 8.1–8.3) against Hartford. *See e.g.* Harris, *Washington Insurance Practice*, § 8:2 (2d ed. 2006) ("The courts have specifically held that only an insured may assert a CPA claim against an insurer."); *see also Tank*, 715 P.2d at 1140 ("It is established that insureds may bring a private action against their insurers for breach of good faith under the CPA.... It is also established that breach of an insurer's duty of good faith constitutes a per se CPA violation.... However, only an insured may bring a per se action.") (citations omitted).

Finally, Ms. Leahy and Mr. Zabel have also "reserved" a claim under the newly-enacted IFCA, RCW 48.30.015(1). (Am. Counterclaims ¶¶ 12.1–12.4.) The IFCA provides that a "first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or payment of benefits by an insurer may bring an action ... to recover the actual damages sustained...." *Id.* The Act defines a first party claimant as "an individual ... asserting a right to payment as a covered person under an insurance policy or insurance contract arising out of the occurrence of the contingency or loss covered by such a policy or contract." RCW 48.30.015(4). As discussed above, Mr. Zabel is not a covered person. Therefore, neither he, nor his assignee, Ms. Leahy, may bring a claim under this provision.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS Hartford's motion for summary judgment (Dkt. # 27), and DENIES Defendants' motion for partial summary judgment (Dkt. # 35).